IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **CHRIN HAULING, INC.,** *et al.*, : | |
| Plaintiffs, : | |
| : | |
| v. : | Civil No. 5:21-cv-03328-JMG |
| : | |
| **JAMES T. CHRIN,** : | |
| Defendant. : | |

**MEMORANDUM OPINION**

**GALLAGHER, J.**                                                                                               **October 23, 2023**

**I.   OVERVIEW**

Plaintiffs Chrin Hauling, Inc., Chrin Brothers, Inc., and Chrin of Delaware, Inc. (collectively, "Plaintiffs") have alleged claims against Defendants James Chrin and Chrin Waste Systems, Inc. d/b/a Control Waste Systems and Control Management System ("CMS"). Plaintiffs' claims arise out of a longstanding intra-family dispute regarding James Chrin's waste management business dealings outside of the Chrin family businesses. Before the Court are cross-motions for summary judgment: the parties believe that there is no dispute of material fact and request this Court to rule on the issues as a matter of law. For the reasons that follow, Defendants' motions are granted in part and denied in part. Plaintiffs' motion is denied. The Court dismisses Plaintiffs' Lanham Act claim (Count I) and declines to exercise supplemental jurisdiction over Plaintiffs' remaining (state law) claims. They will be dismissed without prejudice so that Plaintiffs may bring them in state court.

**II.   BACKGROUND**

   **A.   Relevant Facts**

Plaintiffs are three family-run businesses founded by the late Charles Chrin, *See* Plaintiffs' Statement of Facts ("PSOF") at ¶¶ 1–17, ECF No. 63-2, and they provide a range of

waste-related services such as hauling, compacting, and landfill; they also provide excavation and land development services. *Id.* at ¶ 5; Am. Compl. at ¶ 20. Until his death in June 2018, Charles Chrin was the principal shareholder and President of Plaintiffs. *Id.* at ¶ 13. Charles Chrin had three sons: Dennis, Gregory, and Defendant James Chrin. After Charles Chrin's death, Gregory and Dennis Chrin became the President and Vice President, respectively, and the sole directors of Plaintiffs. *Id.* at ¶¶ 14, 16.[1]

Plaintiffs market their services to the greater Lehigh Valley area. This includes Northampton County and portions of Lehigh and Bucks Counties, and it encompasses the towns of Easton, Bethlehem, Allentown, Nazareth, and Quakertown. *Id.* at ¶ 21. Their largest customer is Lehigh Valley Health Network, which is also a customer of Defendant CMS. *Id.* at ¶ 44. Plaintiffs and CMS also share the following large accounts in the greater Lehigh Valley: St. Luke's University Health Network; Porsche Logistics Services LLC; Victaulic Company; and UGI Corporation. *Id.* at ¶ 45.

During the 1980s, Defendant Chrin worked for Chrin, Inc. *Id.* at ¶ 57. In the early 1990s, Defendant Chrin left his employment with Plaintiffs to work for Chambers, which had recently acquired Plaintiffs' waste hauling business. *Id.* at ¶ 58. Once Plaintiffs began offering waste hauling services again, in 1996, Defendant Chrin was re-hired by Chrin Hauling as a salesperson. *Id.* at ¶¶ 59–60. His responsibilities included, among other things, selling waste-related services and equipment and maintaining customer relationships. *Id.* at ¶ 61. In 2016, Charles Chrin reassigned Defendant Chrin to Chrin family business unrelated to waste management, *Id.* at ¶ 66, because of Defendant Chrin's continued activities with CMS, *see* Joint Appendix ("JA") at

---

[1] Dennis, Gregory, and a trust created for Defendant Chrin's benefit each own a one-third share of Chrin Hauling. Gregory and a trust created for Gregory's benefit own all the voting shares in Chrin Brothers; the non-voting shares are owned by Dennis, Gregory, and Defendant Chrin's Trust. Gregory and Gregory's Trust own all the voting shares in Chrin of Delaware; the non-voting shares are owned by Dennis, Gregory, and Defendant Chrin's Trust. PSOF at ¶ 14.

1680–81 (C. Chrin Dep. 82:4–83:20). By a letter dated July 26, 2021, Plaintiffs terminated Defendant Chrin's employment with Chrin Hauling for, among other reasons, his employment at CMS. PSOF. at ¶ 77, ECF No. 63-2.

CMS was incorporated in Pennsylvania in January 1990, *id.* at ¶ 79, and employs only Jim Chrin and his wife, Jacquelyn Chrin, Resp. to PSOF ("PSOF Resp.") at ¶ 91, ECF No. 68. Although the company's Articles of Incorporation identify its name as "Chrin Waste Systems, Inc. Trading as Control Management Systems, Inc.," PSOF. at ¶ 79, ECF No. 63-2., the company does business as "CMS," a condensed version of Control Management Systems, *id.* at ¶ 83. CMS sells, leases, and services trash compactors. *Id.* at ¶ 86. CMS does not have logos or other trade dress on its equipment or on the clothing of its agents. *Id.* at ¶ 99. During her May 24, 2022 deposition, Jacqueline Chrin testified that CMS avoided using the term "Chrin" because Plaintiffs were already using the word. *Id.* at ¶ 84.

Defendant Chrin is responsible for CMS's compactor sales, leasing, repair, and marketing. *Id.* at ¶ 104–05. Defendant Chrin held many of these same responsibilities in his employment with Chrin Hauling. *Id.* at ¶ 62–65. CMS's business relationships are based on people knowing Defendant Chrin. *Id.* at ¶ 103. From at least 2008 until the termination of his employment with Plaintiffs in July 2021, Defendant Chrin worked for both CMS and one of the Chrin family companies. *Id.* at ¶ 126. Owing to Defendant Chrin's dual roles in competing companies within the same market, the record contains recent examples of customer confusion. *Id.* at ¶ 46. In some instances, CMS' customers and vendors have tried to pay Plaintiffs for services provided by CMS. *Id.* at ¶ 156.

Plaintiffs have been aware of Defendant Chrin's dual roles for some time. On August 26, 2008, a lawyer representing the Plaintiffs sent a letter to Defendant Chrin expressing concern regarding his employment with CMS and requesting that Defendant Chrin divulge any other

3

employers. JA at 192. The letter went on to state Plaintiffs' concerns that Defendant Chrin's outside employment could "jeopardize the company or otherwise tarnish the goodwill and trademark recognition of the same." *Id.*

### B. Procedural History

Plaintiffs commenced this lawsuit against Defendants on July 27, 2021, alleging claims of federal and state trademark infringement as well as state claims for fiduciary breach and conversion. Compl., ECF No. 1. Plaintiffs filed an Amended Complaint on September 13, 2021, adding CMS. Am. Compl., ECF No. 9. No motions to dismiss were filed in this case, but there was a round of summary judgment briefing prior to the motions presently before the Court. In March and September of 2022, the parties filed cross-motions for summary judgment. ECF No.s 29, 41–42. The Court initially agreed to withhold its ruling on these motions in light of then ongoing settlement discussions, and ultimately denied these motions without prejudice while the parties continued to seek a global resolution. ECF No. 58. Following the collapse of those discussions, the parties refiled their respective motions for summary judgment. ECF No.s 61, 63, 64.

### III.  SUMMARY JUDGMENT STANDARD

Summary judgment is properly granted when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Facts are material if they "might affect the outcome of the suit under the governing law." *Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615, 618 (3d Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute as to those facts is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (quoting *Anderson*, 477 U.S. at 248). "We view all the facts in the light most favorable to the

nonmoving party and draw all inferences in that party's favor." *Id.* (internal quotation marks and citation omitted).

The party moving for summary judgment must first "identify[] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). In response, the nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015) (quoting *Anderson*, 477 U.S. at 252).

## IV.  DISCUSSION

For the reasons stated below, Defendants' motion is granted in part and denied in part. Plaintiffs' motion is denied. The Court dismisses Plaintiffs' Lanham Act claim (Count I) and declines to exercise supplemental jurisdiction over Plaintiffs' remaining (state law) claims (Counts II, III, and IV), which are dismissed without prejudice so that Plaintiffs may pursue them in state court.

### A. Infringement [2]

---

[2] Plaintiffs and Defendants argued this case as a trademark infringement claim, Pls.' Mot. at 7 (ECF No. 63-1), and the Court evaluates the cross-motions for summary judgment on those grounds because, under the party presentation principle, it need not consider arguments that the parties themselves do not raise. *See Greenlaw v. United States*, 554 U.S. 237, 243–44 (2008) (discussing the party presentation principle and remarking that "our adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief . . . Courts do not, or should not, sally forth each day looking for wrongs to right." (cleaned up)). It is noted that Plaintiffs did not request this Court to assess their claims under the false designation of origin test, which would seem better suited to cases of alleged palming-off. *See, e.g., Parker v. Google, Inc.*, 242 Fed.Appx. 833, 838 (3d. Cir. 2007). Having elected the infringement path, it is further noted that Plaintiffs did not

Section 43(a) of the Lanham Act, codified at 15 U.S.C. § 1125(a), creates "two distinct bases of liability: false association . . . and false advertising." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 122 (2014); *see also* J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 27:9 (5th ed. 2023) (hereinafter "McCarthy on Trademarks"). Section 1125(a)(1)(A) prohibits "false or misleading" claims that are "likely to cause confusion, or to cause mistake, or to deceive as to . . . the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person[.]" That provision is "the foremost federal vehicle for the assertion of . . . infringement of . . . unregistered marks, names and trade dress[.]" McCarthy on Trademarks at § 27:9. Claims made under this provision are often called "false designation of origin" or "false association" claims. *Parks, LLC v. Tysons Foods, Inc.*, 846 F.3d 220, 226 (3d Cir. 2017).

To prevail on a false association claim, a plaintiff must establish that "(1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion." *Ford Motor Co. v. Summit Motor Prod., Inc.*, 930 F.2d 277, 291 (3d. Cir. 1991) (internal quotation marks omitted) (quoting *Opticians Ass'n of America v. Independent Opticians of America*, 920 F.2d 187, 192 (3d Cir.1990)).

With this legal backdrop established, we now address a few preliminary issues regarding Plaintiffs' infringement argument, which is challenging to follow. Beginning with the mark at issue, Plaintiffs have put forward conflicting and vague definitions throughout the pleadings and summary judgment briefing. They have stated that the mark at issue is "Chrin," but it is also not "Chrin." *Compare* Plaintiffs' Motion for Summary Judgment ("Pls.' Mot.") at 8 (ECF No. 63-1)

---

request that this Court adopt the New York rule in the event that they failed to establish secondary meaning. *See* McCarthy, *infra*, § 15:15. Regardless, the Court views this case best framed as an instance of implied reverse palming-off, for which the Lanham Act provides no relief. *See id.* at § 25:8.

*with id.* at 10 n.4. They have said the mark is "Charles Chrin Companies" (a name that seemingly exists nowhere beyond the papers of this lawsuit), but it is also "James T. Chrin." *Compare Id.* at 8 *with id.* at 13. Perhaps most confounding, Plaintiffs at one point claimed—in circular fashion— that the mark is "the image that Defendant Chrin presents to the consuming public." *Id.* at 10 n.4 Meanwhile, Plaintiffs' Amended Complaint did not even attempt to define the mark at issue; the word "mark" is wholly absent. After reviewing the scattershot options from Plaintiffs', the Court assesses this matter according to the following mark: the use of "Chrin" in connection with waste-related services. *Id.* at 8. The Court uses this mark to address the cross-motions for summary judgment without ruling on whether Plaintiffs have actually identified a mark because, in any case, the Court holds that no reasonable juror could find that Plaintiffs' alleged mark achieved secondary meaning.

Before addressing the merits of Plaintiffs' infringement claim, however, the Court must attend to Defendants' jurisdictional challenge under the Lanham Act.

### 1. Jurisdiction: "In Commerce"

The statute creates an initial jurisdictional hurdle for plaintiffs, who must show that their mark was misrepresented "in commerce," i.e., in interstate commerce, or "intrastate activity—if that activity substantially affects interstate commerce." *Premier Comp Sols., LLC v. Penn Nat. Ins. Co.*, 2012 WL 1038818, at *5 (W.D. Pa. Mar. 28, 2012) (quoting *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 165 (3d Cir. 2001)). The "in commerce" requirement is broadly construed." *See U.S. Healthcare, Inc. v. Blue Cross*, 898 F.2d 914, 922 (3d Cir. 1990).

Defendants' argument on this topic misunderstands the Lanham Act. They argued that this Court's subject matter jurisdiction depends on "whether the *Plaintiffs' market* that is in dispute is interstate[.]" Defs.' Mot. for Partial Summ. J. on Lanham Act Claims ("Defs.' Jurisdiction Mot.") at 5, ECF No. 61-2 (emphasis added). In fact, the text of the Act focuses our inquiry first on

*Defendants' conduct*. A plaintiff must show "that a person, in connection with goods or services, use[d] in 'commerce' a designation or a misleading representation that violate[d] § 43(a)." McCarthy, *supra*, § 27:47; *see also* 15 U.S.C. § 1125(a)(1)(A); *Shatel Corp. v. Mao Ta Lumber & Yacht Corp.*, 697 F.2d 1352, at 1356 (11th Cir. 1983).

Plaintiffs' understanding of the "in commerce" requirement, though closer, still misses the mark. Their response focused on Defendants' interstate activities; but this is insufficient after the 1989 amendment. *See Premier Comp Sols., LLC*, 2012 WL 1038818 at *5 ("In 1989 there was an amendment to § 1125(a) which changed the focus of 'uses in commerce' *from* the goods or services to which a misrepresentation related being used in commerce *to* the misrepresentation itself being used in commerce." (emphasis in original)).[3] Resp. to Defs.' Jurisdiction Mot. at 14, ECF No. 70. "For the Act to apply, the mark itself must be used in interstate commerce." *Laurel Cap. Grp., Inc. v. BT Fin. Corp.*, 45 F. Supp. 2d 469, 478 (W.D. Pa. 1999). The Lanham Act's plain meaning—utilizing "the term 'in commerce' rather than 'affecting commerce' or the even broader 'industry affecting commerce'—reflects a legislative judgment that for the statute to apply, the questioned advertising or statements, and not merely the underlying commercial activity, must be disseminated in commerce[.]" *Id.* at 478 (quoting *Licata & Co., Inc. v. Goldberg*, 812 F.Supp. 403, 409 (S.D.N.Y.1993)). This standard is often met by defendants' advertising, in which case courts are generous in finding jurisdiction even without interstate commercial activity. *See Rickard v. Auto Publisher, Inc.*, 735 F.2d 450, 453 n.1 (11th Cir. 1984) (holding that the "in commerce"

---

[3] Plaintiffs also focused a great deal on Defendants' interstate activities with vendors and others in which Defendants were themselves customers. These sorts of interactions, even if they caused the mark to enter commerce as the standard requires, cannot satisfy the jurisdictional requirement because the Act prohibits infringement that tends to cause confusion among customers, not vendors. *See Ford Motor Co.*, 930 F.2d at 292 ("[A] plaintiff must also prove likelihood of confusion, which is said to exist when the *consumers* viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark.") (emphasis added) (quoting *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1229 (3d Cir. 1978)) (internal quotations omitted).

requirement is met where potential buyers and sellers are in different states). Plaintiffs tried unsuccessfully to show such advertising on behalf of Defendants.[4]

The Court declines to rule on this issue given the deficient briefing and because, in any case, it grants summary judgment regarding the lone federal claim on other grounds. The Court will assume, *arguendo*, jurisdiction.

### 2. Establishing a Valid and Legally Protected Interest in the Mark

Plaintiffs "ha[ve] the burden . . . of proving the existence of a protectable mark" at the time that Defendant allegedly began violating the mark. *See E.T. Browne Drug Co. v. Cococare Prod., Inc.*, 538 F.3d 185, 191 (3d Cir. 2008) (*citing A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 297 (3d Cir. 1986)). When, as in this case, the mark is a surname, a plaintiff must demonstrate that the mark has acquired secondary meaning in order for that mark to receive trademark protection. *See Parks, LLC*, 863 F.3d at 226 (citing *E.T. Browne Drug Co.* 538 F.3d at 191–92). "Secondary meaning" is a term of art in trademark law that refers to "a mental association in buyers' minds between the alleged mark and a single source of the product." McCarthy, *supra*, § 15:5. "Secondary meaning is demonstrated where, 'in the minds of the public, the primary significance of a product feature or term is to identify the source of the product itself.'" *Ford Motor Co.*, 930 F.2d at 291 (citing *Freixenet, S.A. v. Admiral Wine & Liquor Co.*, 731 F.2d 148, 152 (3d Cir.1984)).

The Third Circuit instructs its district courts to consider various non-exclusive factors when determining whether plaintiffs have established secondary meaning. These factors include "the extent of sales and advertising leading to buyer association, length of use, exclusivity of use, the

---

[4] Plaintiffs cite to Defendants' advert in The Hauler, a trade magazine with national circulation. PSOF at ¶ 101, ECF No. 63-2. But upon inspection, the ad makes no mention of CMS. JA 4–5. The Court views this ad as one offering Jim Chrin's personal services and does not exhibit a use of the mark "in commerce."

fact of copying, customer surveys, customer testimony, the use of the mark in trade journals, the size of the company, the number of sales, the number of customers, and actual confusion." *Id.* (citing *CIBA–GEIGY Corp. v. Bolar Pharmaceutical Co., Inc.*, 747 F.2d 844, 852 (3d Cir.1984)) (citations omitted). In essence, Plaintiffs had to show that the market associated "Chrin plus waste services" with Plaintiffs during the relevant period, which is the time just prior to when Defendants allegedly began infringing on Plaintiffs' mark. *See Com. Nat. Ins. Servs., Inc. v. Com. Ins. Agency, Inc.*, 214 F.3d 432, 438 (3d Cir. 2000) (citing *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1231 (3d Cir.1978)) (citations omitted). The "relevant period" requirement directs our attention to the period immediately preceding the allegedly infringing conduct because if a mark did not achieve secondary meaning prior to "infringing" conduct, then there is no cause of action under the Act. *See id.*

In this case, the relevant period can be considered to be no later than August 26, 2008, when Plaintiffs' corporate counsel contacted Defendant Chrin regarding Plaintiffs' "concern[] that [Defendant's] outside business interest may jeopardize the company or otherwise tarnish the goodwill and trademark recognition of the same." JA at 192. There is no dispute over the existence of this letter, and its content indicates that Defendants' allegedly infringing conduct had already begun prior to its postage. Viewing all facts in the light most favorable to Plaintiffs, the mark must have achieved secondary meaning no later than August 26, 2008, else no reasonable jury could find for them.

We consider all but one of the factors relevant to this case (the fact of copying)[5] and hold that no reasonable juror could conclude that "'Chrin" in relation to waste management enjoyed secondary meaning during the relevant time period.

### i. Length and Exclusivity of Use

---

[5] Plaintiffs do not allege copying.

The "length of use" factor favors Plaintiffs. Its mark has been in continuous use since 1955. *See* Defs.' Resp. to PSOF ¶¶ 1–17, ECF No. 68. And no other entity has used the mark during that time, except perhaps Defendants.[6] Proving length and exclusivity of use, alone, does not prove widespread familiarity. *See Parks, LLC*, 846 F.3d at 232–33. As the Court addresses below, Plaintiffs did not cite any evidence that could quantify how widespread the mark has been known at any point since 1955.

### i. Size of the Company: Sales and Customers

The size of a company, as measured by its sales and number of customers, can help determine secondary meaning because the fact-finder is entitled to draw the logical inference that "[the] larger a company and the greater its sales, the greater the number of people who have been exposed to [the] symbol used as a trademark, and the greater the number of people who may associate [that] symbol with a company or source with which they should be familiarized." McCarthy, *supra*, § 15:49. But raw figures lack meaning without context and are not probative of secondary meaning. *See id.*

Plaintiffs stated that they have "thousands" of customers and "revenues in the tens of millions of dollars." Pls.' Mot. at 10, ECF 63. These statements fall far short of information that is probative of secondary meaning. *See, e.g., Parks, LLC*, 846 F.3d 235–36. First, they lack any context. The Court cannot know how these figures compare to Plaintiffs' competitors to assess the likelihood that the market associates "Chrin" with waste management. Second, they lack any temporal or geographic specificity. Are Plaintiffs claiming "tens of millions of dollars" in revenues over a one-year period or ten-year period? Are these revenues and "thousands of customers" concentrated in Pennsylvania? To what degree and in what other states do Plaintiffs claim

---

[6] Defendant is incorporated as "Chrin Waste Systems, Inc. Trading as Control Management Systems, Inc.," but goes by "CMS" and endeavors to avoid any trade dress at all. PSOF at ¶ 83, ECF No. 63-2.

customers and revenues? Third, even if this were helpful information to the Court, the only support for these figures are two sentences in Gregory Chrin's declaration. Decl. of G. Chrin in Supp. of Pls.' Mot. at ¶¶ 14–15, ECF 63-3. As it stands, Plaintiffs' evidence on this factor does not advance their cause.

### ii. Advertising

Secondary meaning is generally "established through extensive advertising which creates in the minds of consumers an association between the mark and the provider of the services advertised under the mark." *Com. Nat. Ins. Servs., Inc.*, 214 F.3d at 438. Use of a mark "for a long period of time in a prevalent advertising campaign" can "create a reasonable inference" of secondary meaning. *See E.T. Browne Drug Co.*, 538 F.3d at 200 (3d Cir. 2008).

The record does not indicate that Plaintiffs conducted an extensive advertising campaign at any point in their history. Defendants stated, and Plaintiffs did not dispute, that Plaintiffs never conducted radio, television, or cable advertising. Non-Jurisdiction DSOF at ¶ 118, ECF 64-2. Although the Court does not believe that these channels are necessary to establish extensive advertising, Plaintiffs' dearth of evidence for other forms of advertising highlights the deficiency of their position. For example, Plaintiffs kept no record of their advertising budget, *id.* at 119, leaving only a handful of circular ads, a brochure, website, and a vague declaration, Decl. of G. Chrin in Supp. of Pls.' Mot. ¶ 5, as support for an alleged extensive advertising campaign. The circular ads are four in total; the dates of circulation cannot be confirmed for three out of the four; and there is no indication of the ads' reach (assuming they are even relevant depending on their dates of circulation). JA at 171–73, 322. The brochure suffers from the same deficiencies. *Id.* at 846. In terms of expenditures, the only specific figure provided in the record ($20,000) comes

from Defendants and involves only the year 2020—twelve years after the relevant period.[7] This factor thus does not advance Plaintiffs' attempt to establish secondary meaning.

### iii. Customer Testimony and Actual Confusion

The views of customers "are relevant to the secondary meaning inquiry only insofar as they are probative of the strength of the . . . mark in the collective consumer consciousness." *Com. Nat. Ins. Servs., Inc.*, 214 F.3d at 440. Despite Plaintiffs' claim that they have thousands of customers, they cited to only a handful in their motion for summary judgment. *See*, Pls.' Mot. at 11–15, ECF No. 63-1. The opinions of a handful of customers do not meaningfully convey to this Court the views of the collective consumer consciousness. *See Parks LLC*, 863 F.3d at 236. But even if they did, customer testimony can be probative only to the extent that it helps establish secondary meaning "just prior to the time and place that the junior user first began use of the accused mark." McCarthy, *supra*, § 15:4. Therefore, this testimony, which dates back only to 2013—five years after the relevant period—cannot support a finding of secondary meaning. Pls.' Mot. at 11 (ECF No. 63-1) (citing customer correspondence between 2013 and 2022). Plaintiffs evidence of actual confusion is similarly deficient because it refers to confusion that occurred between 2019 and 2021. *Id.* at 14. This factor does not advance Plaintiffs' claim of secondary meaning.

### iv. Customer Surveys and the Use of the Mark in Trade Journals

Plaintiffs have never conducted a market research study or performed market surveys. JA at 1612 (C. Chrin Dep 13:21–24). Plaintiffs also do not claim that their mark has ever appeared in a trade journal. No expert reports were conducted to assess Plaintiffs' name recognition. Non-Jurisdiction DSOF at ¶ 115, ECF No. 64-2.

### v. Conclusion Regarding Secondary Meaning

---

[7] Plaintiffs' claimed that they spent "40% more" than $20,000 on advertising in 2018 and 2019, but this is likewise irrelevant since Defendants' alleged conduct began years earlier. *See* JA at 192, 1764, 1681, 175, 1782.

Even though discovery began in this matter in November of 2021, Plaintiffs put forward no probative evidence of secondary meaning beyond establishing that their mark has been in continuous use since 1955 without copying. Plaintiffs either produced no evidence, or none during the relevant period, for all remaining factors. Viewing all the facts and drawing all inferences in the light most favorable to Plaintiffs, they have not submitted sufficient evidence for any reasonable trier of fact to conclude that their mark achieved secondary meaning. Accordingly, this Court grants summary judgment for Defendants on Count I.

### B. Supplemental Jurisdiction

Upon granting summary judgment to Defendants regarding Plaintiffs' Lanham Act claim, the remaining counts in the Amended Complaint allege only state law claims. Pursuant to 28 U.S.C. § 1367(c)(3), a federal court may decline to exercise supplemental jurisdiction over state law claims when it dismisses all claims over which it has original jurisdiction. *See, e.g., Doe v. Mercy Medical Center*, 850 F.3d 545, 567 (3d Cir. 2017) (citing *Elkadrawy v. Vanguard Grp., Inc.*, 584 F.3d 169, 174 (3d Cir. 2009)). "A district court's decision whether to exercise that jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing U.S.C. § 1367(c)(3)). Typically, when "all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988). Given this guidance, the Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining claims. They will be dismissed without prejudice so that Plaintiffs may bring them in state court. *See Kach v. Hose*, 589 F.3d 626, 650 (3d Cir. 2009).

## V. CONCLUSION

For the reasons set out in this memorandum, summary judgment is granted in favor of Defendants with respect to Count I of the Amended Complaint. The Court declines to exercise supplemental jurisdiction as to Plaintiffs' remaining state law claims, which are dismissed without prejudice. The parties should be aware that the period of limitations for these claims was tolled while these claims were pending and "for a period of 30 days after it is dismissed unless State law provides for a longer tolling period." 27 U.S.C. § 1367(d). An appropriate order follows.

BY THE COURT:

 */s/ John M. Gallagher*
JOHN M. GALLAGHER
United States District Court Judge